UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal Action No. 11-10200-JLT |
| | * | |
| MARCEL HENDERSON, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM

August 27, 2013

TAURO, J.

I.   Introduction

Defendant Marcel Henderson was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). In short, officers retrieved a firearm from Defendant's person after conducting a brief stop of Defendant on the sidewalk. Defendant moved to suppress the evidence of the firearm. This court held a three-day evidentiary hearing on the motion. Based on the evidence presented, and for the reasons stated below, this court now orders that Defendant's Motion to Suppress Evidence [#53] is DENIED.

II.   Factual Background

A.   The Testimony

The court heard testimony from eight witnesses. Before detailing the events leading up to Defendant's arrest, as established at the hearing, the court briefly describes the background of key witnesses and notes some important discrepancies in the testimony.

The court heard first from Detective Gregory Brown of the Boston Police Department

("BPD"). Detective Brown has worked with the BPD for twenty-five years and has worked as a detective in the Special Investigations Unit since December 2007. Prior to that time, he worked for fifteen years as a member of the Youth Violence Strike Force, also known as the "Gang Unit." While on the Gang Unit, Detective Brown investigated street gangs, identified and documented membership associations, and conducted long- and short-term investigations of gang-related criminal activity. Detective Brown has conducted close to three hundred firearms arrests over the course of his career.[1]

Detective Brown has also participated in several training programs. In 2003 and 2005, he received training through the ATF on the characteristics of individuals armed with firearms. He also completes biannual BPD firearms training.[2]

Joao Monteiro has worked as a police officer with the BPD Special Investigations Unit for four years. Prior to that, he worked for approximately thirteen years with the Boston Housing Authority Police Department, where he was assigned to the DEA Task Force for twelve years. He focused on drug investigations in the City of Boston.[3]

Three additional law enforcement officials also testified. Special Agent Jason Brissey has worked with the North Shore Gang Task Force of the Federal Bureau of Investigation ("FBI") for more than six years.[4] Lieutenant Martin Conley has worked for the Massachusetts State Police for

---

[1] Mot. to Suppress Hr'g Tr. 21-23, Jan. 4, 2013 [#82] [hereinafter Tr. 82].

[2] Tr. 82 at 24.

[3] Tr. 82 at 138.

[4] Tr. 82 at 122.

fifteen years, eight of those as a lieutenant.[5] Special Agent Scott Vincent Marano Chambers has worked with the FBI for more than eight years. He is assigned to Squad C-2, which focuses on criminal activity in the Boston metropolitan area. He often collaborates with the BPD.[6]

In addition to law enforcement personnel, Defendant and his fiancee, Ebony Nicholson, testified.[7] Their version of events differed from that of law enforcement. They also explained the physical limitations Defendant faces as a result of being shot multiple times in 2008.[8]

The court found the testimony of the officers credible on the key points relevant to this motion. Their stories corroborated each other in important respects. And the officers drew appropriate inferences from their observations based on their extensive experience and pertinent trainings.

The court also found the description of Defendant's physical limitations credible. In particular, after observing Defendant's restricted range of motion in both arms, the court credits his testimony, and that of Nicholson, that he has not driven since his injuries in 2008 and was not driving the day of his arrest. Although this contradicts some of the officers' testimony, the court does not find that it diminishes their overall credibility. Furthermore, because the officers had independent grounds on which to stop him, whether Defendant was driving does not affect the outcome of this case.

---

[5] Mot. to Suppress Hr'g Tr. 18, Jan. 25, 2013 [#84] [hereinafter Tr. 84].

[6] Tr. 84 at 44.

[7] A paralegal at the law firm of Defendant's former counsel also testified as to distances and travel times between certain relevant locations.

[8] See Tr. 84 at 92-97; Mot. to Suppress Hr'g Tr. 15, May 14, 2013 [#93] [hereinafter Tr. 93].

B.  The Incident

The court presents the relevant facts as established during the evidentiary hearing by credible evidence.

In 2007, law enforcement began an investigation into firearms trafficking and cocaine distribution by the Academy Homes Street Gang, led by Owens Brown. In December 2010, officers began intercepting the phone calls of Owens Brown; Hannibal Holliday, an associate of Brown's; and Lamar Axell, the man in charge of Brown's daily affairs. Detective Brown monitored many of the intercepted calls personally.[9]

Just before the new year, the intercepts indicated an escalating exchange between Academy Homes members and an initially unknown male. On December 30, 2010, two individuals entered Brown's territory and tried to launch a "sneak attack" on one of Brown's associates.[10] The intercepted call identified the two individuals as "M-1" and "Marcel." From his investigation, Detective Brown knew of a Marcel who had a bad history with Owens Brown and the Academy Homes gang. He testified that, based on his experience, the call alerted him to potential danger. He monitored the intercepts to see whether the incident would escalate further.[11]

The next day, Detective Brown intercepted several calls stating that someone had left notes on cars telling Brown's associates to pay $30,000 "or else."[12] The callers referred the sender

---

[9] Tr. 82 at 25-27.

[10] Detective Brown explained that a "sneak attack" referred to a plan to do something to a person without his or her knowledge. Tr. 82 at 37.

[11] Tr. 82 at 31-36.

[12] The parties disagree as to whether the notes actually said "or else." It appears that at least some of the intercepted callers believed that they said "or else."

4

of the notes as "f—ed-up arm Marcel."[13] This led Detective Brown to identify Defendant as the source of the notes. Detective Brown knew that Defendant had been shot several times in 2008 throughout his body.[14]

At least one of the intercepted callers took Defendant's threat very seriously. He warned a friend to stay away from Brown. At this point, Detective Brown concluded that a real risk of danger existed. He increased police presence in the gang's territory to deter violence.[15]

Tensions continued to rise on January 1, 2011. Lamar Axell, Brown's associate, made calls to confirm Defendant's identity and arranged to purchase new firearms.[16] Additionally, Victor Rodriguez, another associate of Brown's, called Holliday to report that Defendant had come looking for him. Holliday relayed this information to Brown.[17] Based on this information, Detective Brown concluded that the investigators needed to intervene. They decided to establish surveillance on Defendant beginning the next morning.[18]

Detective Brown held a debriefing on January 2, 2011, and alerted the other team members that, based on the wire intercepts, he expected Defendant to be armed.[19] Officers established surveillance around 11:00 a.m. near 80 Walnut Avenue. Nicholson, Defendant's

---

[13] Tr. 82 at 43.

[14] Tr. 82 at 44.

[15] Tr. 82 at 47-48.

[16] Tr. 82 at 50, 58-59.

[17] Tr. 82 at 60-62.

[18] Tr. 82 at 63-64.

[19] Tr. 82 at 139-40.

fiancee, lived there at the time, and Detective Brown knew Defendant to stay there.[20] Around 1:00 p.m., Detective Brown and Special Agent Chambers, the two officers in the immediate vicinity of 80 Walnut Avenue, observed Defendant, Nicholson, and their young daughter exit the building. They both testified that they witnessed an exchange between Defendant and an unknown male. The two engaged in an animated conversation. The unknown male backed away from Defendant, and Defendant reached toward his waist.[21] In response, the unknown male spread his arms to the side, "as if to show that he had nothing on him,"[22] and backed further away. Detective Brown indicated that Defendant's gesture "was very characteristic of a person that was armed with a weapon in their waist area."[23] The testimony of Detective Brown and Special Agent Chambers was substantially corroborated by Defendant's testimony that he did in fact have a handgun at his waist during this altercation.[24] Special Agent Chambers, Lieutenant Conley, and Officer Monteiro all testified that they heard Detective Brown broadcast his observations and belief that Defendant possessed a firearm over the shared radio frequency.[25]

After the altercation, Defendant, Nicholson, and their child entered a maroon Toyota

---

[20] Tr. 82 at 64.

[21] Tr. 82 at 66-68; Tr. 84 at 87-89.

[22] Tr. 84 at 89.

[23] Tr. 82 at 69.

[24] Tr. 84 at 139.

[25] Tr. 82 at 72-73, 141; Tr. 84 at 33-34, 86. Special Agent Brissey, charged with taking notes on the radio broadcasts during the surveillance, did not write down that Detective Brown called out that Defendant was armed. He did, however, note that Detective Brown observed the exchange shortly after 1:00 p.m.

Camry and drove a short distance around the block. Officers observed the driver of the car make an illegal U-turn against a red light. The car then pulled over to the side of the road, and Defendant exited to the sidewalk. At that point, Officer Monteiro and Lieutenant Conley, who had been following the car, made a U-turn, activated their emergency lights, and pulled behind the Camry. Lieutenant Conley informed Defendant of the traffic violation and asked for his license and registration.[26] Defendant attempted to hand over his wallet, but Conley instructed him to remove the license.[27] Officer Monteiro observed that Defendant seemed nervous and stiff.[28]

Officer Monteiro decided to "pat frisk" Defendant to search for weapons.[29] As he approached, Defendant shifted his body, causing Officer Monteiro's hand to hit Defendant's waist area. Monteiro felt a hard object, which he understood to be a firearm. Defendant responded by pushing Lieutenant Conley away and attempting to run around the car to the driver's side door.[30] Officers, including Special Agent Chambers, exited their cars to assist Monteiro and Conley. Conley, Monteiro, and Chambers tackled Defendant.[31] Officer Monteiro yelled that he saw Defendant holding a gun.[32] Chambers and Monteiro pulled the gun away from Defendant, and

---

[26] Tr. 82 at 142-49.

[27] Tr. 82 at 75-76; Tr. 84 at 37.

[28] Tr. 82 at 149.

[29] Tr. 82 at 149.

[30] Tr. 82 at 149-50.

[31] Tr. 82 at 151-52; Tr. 84 at 82.

[32] Tr. 82 at 152.

Defendant was handcuffed.[33] The officers identified the gun as a nine millimeter Ruger.[34]

III. Discussion

The Fourth Amendment protects individuals from unreasonable searches and seizures.[35] A seizure occurs when a law enforcement officer "has in some way restrained the liberty of a citizen through physical force or show of authority."[36] The court must consider the "coercive effect of the encounter" and determine whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."[37]

When Officer Monteiro and Lieutenant Conley approached Defendant on the sidewalk, they clearly seized him for Fourth Amendment purposes. The government does not argue otherwise. Monteiro and Conley had activated their lights and pulled directly behind the Camry. They informed Defendant of a traffic violation and demanded his license and registration. Defendant submitted to their authority by providing his license.[38] Under these circumstances, Defendant would not have felt free to leave. In fact, the officers testified that he was not free to leave.[39] Consequently, Defendant was seized under the Fourth Amendment.

The question therefore becomes whether the officers had either probable cause or

---

[33] Tr. 82 at 152; Tr. 84 at 82.

[34] Tr. 84 at 82.

[35] U.S. Const. amend. IV.

[36] United States v. Camacho, 661 F.3d 718, 715 (1st Cir. 2011) (quoting Terry v. Ohio, 392 U.S.1, 19 n.16 (1968)) (internal quotation marks omitted).

[37] Id. (quoting Brendlin v. California, 551 U.S. 249, 255 (2007)).

[38] See id. at 726.

[39] Tr. 82 at 162; Tr. 84 at 33.

reasonable suspicion to seize Defendant at the time they approached him. "Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible."[40] Both inquiries focus on the same factors.[41] But reasonable suspicion calls for a "lesser showing" than probable cause.[42] "Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime."[43] Reasonable suspicion requires only that an officer " 'be able to point to specific and articulable facts which, taken together with rational inferences from those facts,' justify an intrusion on a private person."[44] In both cases, the court must first examine the historical events leading up to the stop and then determine whether these facts, viewed from the perspective of an objectively reasonable officer, amount to reasonable suspicion or probable cause.[45]

After considering the totality of the circumstances, the court concludes that the officers had probable cause, and certainly reasonable suspicion, to stop Defendant. The historical facts evidenced an escalating conflict between Defendant and Brown. The phone intercepts indicated that Defendant, known to have a troubled past with the Academy Homes gang, had begun to

---

[40] Ornelas v. United States, 517 U.S. 690, 695 (1996).

[41] United States v. Jones, 700 F.3d 615, 621 (1st Cir. 2012), cert. denied, 133 S. Ct. 1619 (2013).

[42] Id. (quoting Alabama v. White, 496 U.S. 325, 328-29 (1990)).

[43] United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997).

[44] Jones, 700 F.3d at 621 (quoting Terry v. Ohio, 392 U.S.1, 21 (1968)).

[45] Ornelas, 517 U.S. at 696.

threaten Brown and his associates. Over the three days preceding the stop, these threats escalated such that one gang member warned a friend to stay away from Brown for fear that he would get caught in gun fire. The Academy Homes members took Defendant's threats seriously enough to warrant arming themselves.

Against this backdrop, Detective Brown and Special Agent Chambers saw Defendant, shortly before the stop, gesture toward his waist in a manner characteristic of an individual carrying a firearm. In interpreting this gesture, Detective Brown properly relied on his extensive ATF training and on the almost three hundred firearms arrests made throughout his career.[46] He shared this information with his team members, including Officer Monteiro and Lieutenant Conley.[47] Consequently, at the time Monteiro and Conley approached Defendant on the sidewalk, they had sufficient trustworthy information on which to conclude that Defendant was carrying a firearm.[48]

This court also concludes that the agents acted within the scope of the stop. "Once an officer has formed a reasonable belief that a detained person may be armed and dangerous, a pat-down for protective purposes is, without more, deemed reasonably related in scope to the stop."[49]

---

[46] Id. at 700 ("[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists.").

[47] United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999) ("[T]he focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation.").

[48] These facts also indicate that Monteiro and Conley had "a particularized and objective basis for suspecting [Defendant] of criminal activity." United States v. Espinoza, 490 F.3d 41, 47 (1st Cir. 2007) (quoting Ornelas, 517 U.S. at 696) (internal quotation marks omitted).

[49] United States v. Ruidiaz, 529 F.3d 25, 33 (1st Cir. 2008).

Officer Monteiro acted reasonably in attempting to pat down the outer layer of Defendant's clothing to search for a firearm. And once Monteiro felt what he believed to be a firearm and Defendant turned to run away, the officers acted in a manner "fairly responsive to the emerging tableau."[50] Defendant posed a significant risk to the officers' safety and the safety of bystanders.[51] At one point the officers saw Defendant with his hand on the gun. They responded reasonably by detaining Defendant and retrieving the gun.[52] They did not exceed the stop's permissible scope.

IV.   Conclusion

Because the law enforcement officers had probable cause, and certainly reasonable suspicion, to stop Defendant, the evidence seized from Defendant pursuant to that stop is admissible. Defendant's Motion to Suppress [#53] is accordingly DENIED.

AN ORDER HAS ISSUED.

/s/ Joseph L. Tauro
United States District Judge

---

[50] Id. at 29 (quoting United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001)).

[51] At least Nicholson, her child, and a friend were nearby.

[52] See United States v. Jones, 700 F.3d 615, 624-25 (1st Cir. 2012), cert. denied, 133 S. Ct. 1619 (2013) ("[P]olice conducting a *Terry* stop are entitled to take reasonable measures to protect their own safety[,] and taking such measures does not transform a *Terry* stop into an arrest.").